IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

ALBERT C. HAIRSTON,                    :

      PETITIONER-APPELLANT,   :

      v.                                         :        No. 12-3098

ROY HENDRICKS, ET AL.,                :

      RESPONDENT-APPELLEE.   :

_____

On Appeal from the United States District Court
for the District of New Jersey, Civ. No. 99-5225 (KSH)
_____

APPELLANT'S PETITION FOR REHEARING EN BANC,
PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 35(b)
_____

RICHARD COUGHLIN
Federal Public Defender

Alison Brill, *On the Brief*
Research & Writing Attorney

22 S. Clinton Ave.
Station Plaza #4, Fourth Floor
Trenton, New Jersey 08609
(609) 989-2160

*Attorneys for Petitioner-Appellant*
*Albert C. Hairston*

**Statement of Counsel Pursuant to Local Appellate Rule 35.1**

I express a belief, based on a reasoned and studied professional judgment, that the panel's opinion is contrary to decisions of the Supreme Court of the United States and of this Circuit, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court.

I.    The panel's opinion conflicts with *Purkett v. Elem*, 514 U.S. 765 (1995); *Hernandez v. New York*, 500 U.S. 352 (1991); and *Lark v. Secretary Penn. Dept. of Corrections*, 645 F.3d 596 (3d Cir. 2011), which require courts to evaluate whether a prosecutor has set forth valid race-neutral reasons at Step Two before reaching *Batson's* Step Three analysis.

II.   The panel's opinion conflicts with *Batson v. Kentucky*, 476 U.S. 79 (1986); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Holloway v. Horn*, 355 F.3d 707 (3d Cir. 2004); and *Riley v. Taylor*, 277 F.3d 261 (3d Cir. 2001), which require courts to consider "all relevant circumstances" at Step Three and engage in comparative analysis when appropriate.

III.  The panel failed to conduct a complete AEDPA analysis once it determined the deferential standard of review applied, in contravention of *Miller-El v. Dretke*, 545 U.S. 231 (2005); and *Hardcastle v. Horn*, 368 F.3d 246 (3d Cir. 2004).

# TABLE OF CONTENTS

Statement of Counsel Pursuant to Local Appellate Rule 35.1.....................................i

Table of Authorities ............................................................................. iii

Statement of the Case ............................................................................1

Argument in support of en banc rehearing ............................................................4

I.      The panel's opinion conflicts with Supreme Court and Third Circuit precedent with respect to what Batson requires at Steps Two and Three .....4

II.     *Batson* required a comparative analysis not merely a barebones ruling ............................................................................7

III.    The panel decision failed to conduct a complete AEDPA analysis once it determined the deferential standard of review applied .................................11

Conclusion ............................................................................15

Certificate of Compliance and Service .................................................................16

EXHIBIT 1: Copy of Panel Opinion

EXHIBIT 2: Copy of Order

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Batson v. Kentucky*, 476 U.S. 79 (1986) .......................................................... *passim*

*Coombs v. Diuglielmo*, 616 F.3d 255 (3d Cir. 2010),
    *remanded for evidentiary hearing,* 912 F.Supp2d 228
    (ED Pa. 2012), *habeas grant reversed*, No. 13-1147,
    2014 WL 4179950 (Aug. 25, 2014) (not precedential) ......................8, 13

*Hardcastle v. Horn*, 368 F.3d 246 (3d Cir. 2004) ..............................................4, 12

*Harrison v. Ryan*, 909 F.2d 84 (3d Cir. 1990) ......................................................5, 8

*Hernandez v. New York*, 500 U.S. 352 (1991) .........................................................5

*Holloway v. Horn*, 355 F.3d 707 (3d Cir. 2004) ......................................................9

*Johnson v. California*, 545 U.S. 162 (2005) ...........................................................10

*Lark v. Pa. Dept. of Corrections*, 645 F.3d 596 (3d Cir. 2011),
    *order issued sub nom.*, *Lark v. Beard*, 2012 WL 3089366
    (ED Pa. July 3, 2012) ...........................................................................4, 12

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ......................................9

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ........................................... 6 n.3, 12-13

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ........................................................8, 9, 11

*Norton v. Spencer*, 351 F.3d 1 (1st Cir. 2003) ......................................................14

*Purkett v. Elem*, 514 U.S. 765 (1995) .....................................................................5

*Riley v. Taylor*, 277 F.3d 261 (3d Cir. 2001) ....................................................8, 10

*Snyder v. Louisiana*, 552 U.S. 472 (2008) .........................................................8, 11

iii

*State v. Gilmore*, 511 A.2d 1150 (N.J. 1986) ............................................................1

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) ....................................................13

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ......................6

*United States v. Grant*, 563 F.3d 385 (8th Cir. 2009) ..............................................5

*United States v. Thompson*, 735 F.3d 291 (5th Cir. 2013) .......................................5

*United States v. Uwaezhoke*, 995 F.2d 388 (3d Cir. 1993) ......................................5

## <u>Statutes</u>

28 U.S.C. §2254 .................................................................................. 2, 9, 12-13

## <u>Constitutions, Rules and Other Authorities</u>

Local Appellate Rule 35.1 ...........................................................................i

## STATEMENT OF THE CASE

Albert C. Hairston faced capital murder and other charges for shooting and killing Susan Modoski and shooting and wounding Susan Kerestes on Christmas morning, 1989, while staying as their guest.  Mr. Hairston is an African-American male and the victims were Caucasian females.  Voir dire was conducted over several months.  Over 27 days between September 4 and October 18, 1991, jurors filled out 19-page questionnaires about their background, education, and potential bias, and qualification to serve on a capital jury and were then individually interviewed by the court and parties.  The few days of transcripts still available from voir dire suggest at least 180 people were questioned in person.

On October 29, 1991, jury selection commenced.  50 names were put into a box and randomly selected to fill 16 seats, to be re-filled after each peremptory challenge.  Of the 12 peremptory challenges the state had, it exercised ten.  Of those ten, it excused seven African-American jurors.  Defense counsel made a motion for a mistrial under *Batson v. Kentucky*, 476 U.S. 79 (1986) and *State v. Gilmore*, 511 A.2d 1150 (N.J. 1986) – the New Jersey analogue to *Batson*.  After hearing the prosecutor's reasons for his strikes, defense counsel sought to show that those same reasons applied to the jurors the state had not excused.  The trial judge refused to consider this comparative argument:

1

"[T]he defense does not have a right I don't believe to puts its own place – put himself into [the] prosecutor's shoes [to] determine what challenges in their view were valid, invalid." (A92).

The prosecutor "has to put forth an argument that he believes will justify his exercise of challenges; that doesn't mean that you have a right to respond to each and every statement he made based upon what he says." (81).

"Counsel, you don't have a right to go through each questionnaire with every juror whose sitting and compare them to whose you think were wrongfully excused." (90).

"It is impossible to pull out from that hour and a half [voir dire] or it is possible really to pull out in that hour and a half anything normally to support your view. *Gilmore* requires that if there's a showing, that the State must come forward with reasons as to why it used its challenges." (91-92)

"Counsel, we're not going to argue everybody who's on the jury as against the people that are off this jury, we will never finish the case this way." (82).

The trial judge denied the *Batson* motion. Immediately thereafter, the jury was sworn and trial commenced. The jury convicted Mr. Hairston of all counts but did not impose the death penalty. Mr. Hairston was sentenced to life imprisonment with forty years of parole ineligibility.

A panel of the Appellate Division affirmed the conviction and sentence, denying all issues, including the *Batson* claim.

After exhausting state post-conviction relief, Mr. Hairston filed a *pro se* petition for habeas corpus, pursuant to 28 U.S.C. § 2254, in November 1999. In

2

July 2012, without holding an evidentiary hearing, the District Court denied Mr.

Hairston's petition and denied him a certificate of appealability.

Mr. Hairston filed a *pro se* motion for a certificate of appealability. This

Court ordered the state to submit the October 29, 1991 transcript[1] of jury selection

and motion for a mistrial under *Batson* and then certified the *Batson* issue.

On September 3, 2014, following oral argument before Circuit Judges

Rendell, Smith, and Hardiman, a not precedential opinion issued affirming the

District Court's denial of habeas relief (per Hardiman, J., with Smith, J.)

(hereinafter cited as "Opinion"). The panel found the state court made an implicit

Step Three *Batson* finding and that applying AEDPA deference was "outcome-

determinative." (Opinion, 21). Before finding the state court had, in fact,

adjudicated the *Batson* claim, the panel expressed "serious cause for concern"

about the record, including that the Appellate Division implied the analysis was

over once the state carried its burden. (Opinion, 17-18). Nonetheless, the basis of

the panel's Step Three finding was that (1) the trial judge heard argument from

both sides, (2) the trial judge made a credibility determination when it said it found

---

[1] This transcript and other relevant decisions were included in Volumes I, II, and
III of Appellant's Appendix, herein cited as "A." Relevant to this motion, counsel
directs this Court to the October 29, 1991 jury selection process, counsel's
arguments, and the trial judge's *Batson* ruling, (A38-94); the New Jersey Appellate
Division's 1995 decision on direct appeal affirming denial of *Batson*, (A95-124);
and the District Court's 2012 denial of habeas relief, (A3-28).

the prosecutor's reasons "to be valid and sufficient in the record," and (3) the

Appellate Division found that the trial judge's "findings were sufficiently

grounded in the record." The panel emphasized that both courts used the word

"find." (Opinion, 19). One judge dissented, finding it "abundantly clear" the state

court failed to reach Step Three and that habeas relief was necessary where it is

now impossible to reconstruct all that occurred in voir dire (per Rendell, J.)

(hereinafter cited as "Dissent"). A copy of the opinion and order are attached. [2]

### ARGUMENTS IN SUPPORT OF EN BANC REHEARING

I. **The panel's opinion conflicts with Supreme Court and Third Circuit precedent with respect to what *Batson* requires at Steps Two and Three**

As the dissent cogently lays out (Dissent, 2-9), the panel's decision cannot

be reconciled with *Batson* or other Supreme Court and Third Circuit cases that

analyze the separate inquiries at Steps Two and Three of the *Batson* analysis.

Although the burden is low, a Step Two finding is necessary to the *Batson*

analysis. *See, e.g.*, *Lark v. Secretary Pennsylvania Dept. of Corrections*, 645 F.3d

596 (3d Cir. 2011) (finding District Court clearly erred when it ended inquiry at

Step Two and remanding for Step Three analysis); *Hardcastle v. Horn*, 368 F.3d at

259 (3d Cir. 2004) (holding state court unreasonably applied *Batson* when it

proceeded to Step Three without finding government gave an adequate justification

---

[2] Chief Judge McKee and Judge Greenaway, voted for rehearing *en banc*.

at Step Two and remanding for hearing); *Harrison v. Ryan*, 909 F.2d 84 (3d Cir. 1990) (explaining prosecutor's inability to recall reason as to one juror was insufficient to satisfy Step Two and granting habeas relief). The panel's ruling that the state court made Step Three "findings" essentially omits Step Two, in contravention of the Supreme Court's admonition not to conflate Steps Two and Three. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

The panel's interpretation that the word "valid" reflects a credibility determination at Step Three is also contrary to Supreme Court and Circuit precedent which regard validity as a Step Two finding. *See Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion) (explaining that the Step Two "issue is the facial validity of the prosecutor's explanation"); *United States v. Uwaezhoke*, 995 F.2d 388, 392 (3d Cir. 1993) (" . . . and we pass to the third step of Batson analysis to determine whether the race-neutral and facially valid reason was, as a matter of fact, a mere pretext for actual discriminatory intent."). Other Circuits agree. *See United States v. Grant*, 563 F.3d 385, 396 (8th Cir. 2009) (finding facially valid reason before moving to Step Three); *see also United States v. Thompson*, 735 F.3d 291, 297 n.14 (5th Cir. 2013) (explaining inattentiveness is a "valid, race-neutral reason[]" for a strike).

Even more than the language, it is the context of the state court findings that demonstrates both courts stopped at Step Two.  (Dissent, 5).  The trial judge plainly misapprehended what *Batson* required at Step Three.  (A81, 83, 89-92, 94). The Appellate Division reviewed how the prosecutor had put forth *valid* race-neutral reasons in a capital case with an intoxication defense and found the trial judge had reasonably exercised his discretion because the prosecutor's reasons "related to jurors views about the death penalty, the use of alcohol, and reasons involving family members in crime." (A21-22).[3]  That this is a Step Two finding is best illuminated by the Appellate Division's conclusion that "[t]he State carried its burden by articulating clear and reasonably specific explanations of its legitimate reasons for exercising each of their peremptory challenges."  (A22 (citing Step Two burden in *Batson*, 476 U.S. at 98 n.20, and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981))).

The record here demonstrates a clear Step Two finding.  The majority decision, piecing together a Step Three *finding*, essentially omits Step Two and

---

[3] The panel further stretches the import of the Appellate Division decision, finding that "sufficiently grounded in the record" "evidences a consideration of all of the facts and arguments presented."  (Opinion, 20).  There is no evidence the defense rebuttal and facts in support of it were ever considered.  *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 344 (2003) (*Miller-El I*) (questioning appellate court affirming denial of a mistrial with a "dismissive and strained interpretation of [ ] evidence of disparate questioning" and ultimate holding that the "findings of the state court that there was no disparate questioning . . . [is] fully supported by the record").

undercuts the Step Three analysis.  Although the panel's opinion is not binding

authority, there are limited Supreme Court and Third Circuit decisions on the

intersection of Steps Two and Three and this opinion creates conflict that should be

resolved by the full Court.  Moreover, because of the dearth of cases, the panel's

opinion will permit District Courts, tasked with administering *Batson*, to conflate

the *Batson* analysis, a disservice to the mandates of *Batson* and to appellate review.

## II.    *Batson* **required a comparative analysis not merely a barebones ruling**

The panel reduces *Batson's* Step Three analysis to a rudimentary finding,

holding that *Batson* merely instructs trial courts to determine if the defendant has

established purposeful discrimination.  "Consistent with this instruction," the panel

writes, the trial judge heard arguments from both sides, and then found the

prosecutor's reasons credible.  (Opinion, 19).  But this is non-responsive to defense

counsel's arguments that the prosecutor's striking criteria was disproportionately

applied to African-Americans; the strike rate for African-Americans was 70

percent.  It was not a credibility call but an examination of the record.  Defense

counsel began his response by asking for time to review the juror questionnaires,

which the trial judge denied.  It is clear the trial judge, in rushing defense counsel

through his arguments, did not himself consult notes, voir dire transcripts, or jury

questionnaires.  It is particularly ironic that the panel now uses defense counsel's

7

vigorous arguments about what *Batson* required at Step Three, which the trial judge technically "heard" but repeatedly rejected, to establish the trial judge made a Step Three "finding."   (*See* Opinion, 19).

A Step Three analysis is not a matter of rote, it develops with the demands of each case.  *Batson* instructs: "When circumstances suggest the need, the trial court must undertake a factual inquiry that takes into account all possible explanatory factors in the particular case." 476 U.S. at 95 (internal quotation and citation omitted); *see, e.g.*, *Snyder v. Louisiana*, 552 U.S. 472, 478-84 (2008) (painstaking review of trial court record); *Miller-El v. Dretke*, 545 U.S. 231, 240-66 (2005) (*Miller-El II*) (same).  Full consideration of the evidence and objection-by-objection rulings are necessary, inasmuch as a single *Batson* violation requires reversal.  *See Harrison*, 909 F.2d 84.  While a trial court need not explicitly discuss every piece of evidence, "some engagement with the evidence considered is necessary as part of step three of the Batson inquiry."  *Riley v. Taylor*, 277 F.3d 261, 289 (3d Cir. 2001) (en banc); *accord Coombs v. Diguglielmo*, 616 F.3d 255, 263 (3d Cir. 2010) (stating how comparison with white jurors "would have been an essential part of any meaningful inquiry into the prosecutor's explanation").

The panel decision devitalizes *Batson* and excuses the trial judge's refusal to engage in a comparative analysis because the Supreme Court did not say until 14

years after Mr. Hairston's trial, in *Miller-El II*, that such analysis can be powerful evidence of discrimination.  (Opinion, 15 n.5).  But *Batson* itself demands this much, instructing courts to consider "all relevant circumstances" from the case at hand to determine if racial discrimination impermissibly motivated the exercise of peremptory challenges.  476 U.S. at 92 (eschewing *Swain v. Alabama*'s crippling burden that defendants had to produce evidence of systemic discrimination, in favor of its equal protection jurisprudence); (*see also* Dissent, 2-4 (laying out *Batson*'s genesis and explaining comparative analysis had always been "especially relevant" to Step Three in the employment discrimination cases (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)))).  Because the *Batson* analysis ends with the difficult question of intent, "a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal citation and quotation omitted).

*Miller-El II* was simply an illustration of the proper application of *Batson*'s approach and was itself decided on collateral review of a trial that occurred before *Batson*.  Indeed, this Court has consistently relied on comparative analysis in habeas proceedings under 28 U.S.C. § 2254.  *See, e.g.*, *Holloway v. Horn*, 355 F.3d 707, 724 (3d Cir. 2004) (granting habeas relief in a case tried before 1990) (calling the relevance of a comparative analysis on a *Batson* claim "firmly established");

9

*Riley v. Taylor*, 277 F.3d 261, 282 (3d Cir. 2001) (employing a comparative analysis and granting habeas relief on the *Batson* claim).  That such comparative analysis was required by *Batson* in 1991, and intuitively necessary to prove purposeful discrimination in the three-step context, is best borne out by defense counsel's repeated pleading to the trial judge that to prove a negative once the prosecutor gave valid reasons, he must be permitted "to reflect that against the people who were not excused." (A91).  Moreover, such comparison was particularly relevant here where the prosecutor acknowledged that his criteria for striking African-American jurors, that he was wary of jurors who believed alcohol and drugs could affect behavior, was self-evident, stating "we would all agree it's logical that the more you drink the more you're affected." (A70).  Indeed, nearly every juror admitted to this very same opinion.  If a comparative analysis were employed, this record establishes pretext.

Finally, the panel defers to what it calls an "implicit step-three finding" because the ruling was made in "live combat." (Opinion, 20).  Permitting this barebones ruling conflicts with the *Batson* framework, which was "designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson v. California*, 545 U.S. 162, 172 (2005).  It permits trial courts to impede fact-finding and record creation,

circumventing the *Batson* inquiry at the moment the court has a duty to perform

the analysis. Moreover, the "live combat" notion assigns undue omniscience to the

trial judge, here tasked with overseeing a several month capital voir dire and ruling

on the qualifications of hundreds of jurors. *Cf. Snyder*, 552 U.S. at 479 (explaining

trial court did not make finding as to juror's demeanor, possibly because he did not

recall a juror who was challenged the day after he was questioned with dozens of

jurors in between). A contemporaneous factual objection should be settled

contemporaneously and explicitly.

The panel decision was contrary to Supreme Court and Third Circuit law

with regard to *Batson's* Step Three requirement. Although the opinion for review

here is not precedential, it lowers the bar for what will satisfy *Batson* and AEDPA

below what this Court has previously deemed sufficient, and what the United

States Supreme Court has upheld and warrants correction by the full Court.

## III.    The panel decision failed to conduct a complete AEDPA analysis once it determined the deferential standard of review applied

The panel's AEDPA analysis is also contrary to Supreme Court and Third

Circuit precedent. Once the panel determined the state courts had made a Step

Three finding, it essentially ended its inquiry, citing case after case for deference.

(Opinion, 21-22). The panel failed to follow the rigorous AEDPA standard, which,

although "demanding [is] not insatiable." *Miller-El II*, 545 U.S. at 240; *see, e.g.*,

*Lark*, 645 F.3d at 617-18 ("We can understand why by this time a reader of this opinion would wonder whether we ever would reach the substantive issue . . . But we now reach the merits issue on this appeal."). Deference "does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El I*, 537 U.S. at 341.

Assuming, arguendo, that the barebones rulings reviewed here constitute a Step Three finding, the question is whether denial of relief was "contrary to, or involved an unreasonable application of, clearly established [Supreme Court] law." 28 U.S.C. § 2254(d). The panel's difficulty in finding that the courts completed Step Three, (Opinion, 17-18), is relevant to its deferential review under AEDPA. If patching together the trial judge's comments -- which, of course, were uttered while both rushing defense counsel and foreclosing lines of relevant argument and fact-finding – creates a *finding*, it does not produce a sufficient record that the trial court understood or undertook a Step Three *analysis*. Indeed, in *Hardcastle*, which was decided under AEDPA, this Court could not conclude the state court's resolution "amounted to an objectively reasonable application" where the state court "failed to conduct a full and complete step three analysis." 368 F.3d at 255. This Court has also ruled that foreclosing a defendant's opportunity to prove that the prosecutor's proffered reasons for striking African-American jurors was

12

pretextual and thus prove discriminatory intent "effectively omitted" Step Three.
*See, e.g.*, *Coombs*, 616 F.3d at 263.  Failure of a state court to conduct an adequate
Step Three analysis renders its decision objectively unreasonable.

AEDPA also permits relief where the decision "was based on an
unreasonable determination of the facts in light of the evidence presented."  28
U.S.C. § 2254(d).  A state court's fact-finding may be unreasonable where "the
state court . . . had before it, and apparently ignored," evidence supporting a
petitioner's claim, *Miller–El I*, 537 U.S. at 346, or where the state court neglected
to make a finding of fact it should have made, makes factual findings infected by
substantive legal error, the fact-finding process itself is defective, or the state
courts plainly misapprehend or misstate the record in making their findings, and
the misapprehension goes to a material factual issue, *Taylor v. Maddox*, 366 F.3d
992, 1000-01 (9th Cir. 2004) (citing cases).  While a court is not required to "make
detailed findings addressing all the evidence before [it]," *Miller–El I*, 537 U.S. at
347, if the overlooked or ignored evidence is highly probative and central to a
defendant's claim, failure to fact-find is unreasonable.  *See, e.g.*, *Taylor*, 366 F.3d
at 1000-01 (determining record contained clear evidence to make factual findings
and that the determination that the confession was voluntary was unreasonable).

Here, the trial judge did not engage with the multitude of material factual disputes defense counsel raised to support the *Batson* claim. The trial judge did not decide whether the prosecutor was distorting the record on various excused African-American jurors, like which juror had an alcoholic husband who used cocaine. Similarly, the trial court did not decide if any of the sitting jurors gave the same or even less-prosecution friendly answers as the excused African-American jurors. The trial judge refused to consider any comparative arguments, and also said nothing in response to challenges to the prosecutor's factual recitations. To the extent the Appellate Division's approval of the trial court's finding is a factual conclusion, it is also unreasonable. *Cf. Norton v. Spencer*, 351 F.3d 1, 6–8 (1st Cir. 2003) (holding that appellate court's finding that trial judge viewed affiants as incredible was an unreasonable determination of the facts when it did not appear the trial judge even consider the credibility of the affidavits). The slender reed of a support for a Step Three finding should make the deferential analysis under AEDPA more nuanced. Instead, the panel simply said Mr. Hairston could not meet his burden. More was required and a proper evaluation would have shown that Mr. Hairston's case demands relief.

The unreasonable-factual-determination prong is an important area of AEDPA analysis and a question of exceptional importance to District Courts

tasked with this evaluation.  This case, with its defective fact-finding process,

presents an opportunity for en banc review and explanation of this issue.


## CONCLUSION

For the reasons set forth above, *en banc* review is appropriate.


Respectfully submitted,

RICHARD COUGHLIN
Federal Public Defender

s/ *Alison Brill*
Research and Writing Attorney

22 South Clinton Ave., Station Plaza #4, 4th Fl.
Trenton, NJ 08609
(609) 989-2160

*Attorneys for Petitioner-Appellant*
Albert C. Hairston


Dated:              September 17, 2014
                    Trenton, New Jersey

## CERTIFICATE OF SERVICE AND COMPLIANCE

Alison Brill hereby certifies as follows:

1.  I am an attorney with the Office of the Federal Public Defender and I am admitted to practice before the United States Court of Appeals for the Third Circuit.

2.  I have caused an electronic copy of the petition for rehearing en banc to be filed today, September 17, 2014.

3.  I have also caused a copy of the petition to be served upon the State of New Jersey by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system and by United States mail, upon the following Filing User:

> Sara B. Liebman
> Special Deputy Attorney General/Acting Assistant Prosecutor
> Union County Prosecutor's Office
> County Administration Building
> Elizabeth, NJ 07207

5.  I certify that pursuant the attached petition for rehearing en banc is in compliance with Fed.R.App.P. 32(c) and 40(b) does not exceed 15 pages.


The foregoing is true and correct to the best of my knowledge and information.  I am aware that if any of the foregoing is willfully false, I am subject to sanctions.


Date:        September 17, 2014                              s/ Alison Brill
             Trenton, New Jersey

16

EXHIBIT 1

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3098
_____

ALBERT C. HAIRSTON,
                                          Appellant

v.

ROY L. HENDRICKS; ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

_____

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 2-99-cv-05225)
District Judge:  Honorable Katharine S. Hayden
_____

Argued March 6, 2014
Before:  RENDELL, SMITH and HARDIMAN, *Circuit Judges*.

(Filed: September 3, 2014)

Alison Brill, Esq.     [Argued]
Office of Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, NJ 08609

Richard Coughlin, Esq.
Office of Federal Public Defender
800-840 Cooper Street
Suite 350
Camden, NJ 08102
          *Attorneys for Appellant*

Sara B. Liebman, Esq.        [Argued]
Union County Office of Prosecutor
County Administration Building
32 Rahway Avenue
Elizabeth, NJ 07202
        *Attorneys for Defendant-Appellees*

_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

Albert Hairston appeals the District Court's order denying his petition for writ of habeas corpus, in which he alleged a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The District Court, applying the deferential standard of review established in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, held that Hairston failed to show that the state court's decision was contrary to, or involved an unreasonable application of, *Batson*. We will affirm.

I

Unlike most habeas defendants, Hairston does not assert his innocence; he admits to shooting two co-workers, one fatally, and claims intoxication as a defense. The New Jersey state court provided a thorough and detailed account of the facts, *see State v. Hairston*, No. A-4203-91T4 (N.J. Super. Ct. App. Div. Feb. 21, 1995) (slip op.), which the District Court's opinion recounted as follows:

Hairston worked at a bakery in Long Branch, New Jersey, along with Susan Kerestes and Susan Modoski, the victims of the crimes for which Hairston was tried and convicted. Kerestes and Modoski shared a house together in Kenilworth, New Jersey. Over time, they developed a friendship with Hairston and would occasionally drive him home or socialize after work.

On December 23, 1989, Hairston called Kerestes and told her his holiday plans with his girlfriend had not worked out. He asked if he could stay with Kerestes and Modoski for the Christmas weekend. After conferring with Modoski, Kerestes told Hairston that he could stay with them. The women picked him up at the bakery at about 4 p.m. and drove him to their home. Hairston stayed on the living room couch for the next two nights. On Christmas morning, Kerestes and Modoski woke early to attend brunch at Kerestes' parents' house. Before they left, they told Hairston what they had planned for the day, and that Modoski's father had invited him to Christmas dinner.

Kerestes and Modoski left around 10:00 a.m. and returned home around 1:30 p.m. As they entered through the back door, Modoski stopped at the refrigerator for a drink while Kerestes continued walking towards the dining room. She saw clothes scattered on the floor and assumed that Hairston was in the shower. Then he appeared in the hallway and said, "Oh, I meant to tell you ladies I'm not going." According to the trial testimony of Kerestes, who survived the events of the next minutes, Hairston then shot Modoski, turned, and began firing at Kerestes. She was hit by a number of shots and was propelled backwards until she fell to the floor of the hallway.

Hairston stopped firing, turned, and walked into the kitchen. Kerestes heard him fire another shot, presumably at Modoski. When Kerestes tried to stand, using a door handle for support, Hairston returned to the hallway and shot at her again. She fell back to the floor and Hairston stood over her. When he fired at her again, she turned her head and the bullet struck the floor next to her. She later described Hairston as being "very focused looking straight at her" when he fired that shot.

Kerestes managed to get to her feet, reach a telephone, and call her parents, yelling into the phone for them to call for help. Hairston left the

house. An alert went out, and a short time later, a patrolman in the neighboring town of Roselle Park observed and detained Hairston, who was walking across a dirt lot at a quick pace with blood stains on his pants and shoes. After other officers arrived, Hairston was subdued and placed under arrest. He carried $21.61 in change, a two-dollar bill, and a key in his front pants pockets and four twenty-dollar bills in his sock. He claimed that the money was his and that he had a habit of putting money in his socks. The subsequent police investigation indicated that Hairston had stolen this money from Kerestes and Modoski's house: Hairston's fingerprints were found on a jar in the house where the victims had kept money, including at the time four twenty-dollar bills, change, and a number of two-dollar bills. At trial Hairston testified that he received the money from an electrical job he had performed prior to the weekend in question.

An officer searching the crime scene near the house found Hairston's blood-stained denim jacket with a box of bullets and a photograph taken from the house in one of the pockets. Another officer found two pistols in nearby shrubbery. Kerestes confirmed that she and Modoski owned these pistols and that they were the guns that Hairston used to shoot them. Hairston's fingerprints were found on one of the pistols.

Modoski died as a result of the gunshot wounds. Kerestes survived and testified for the State at Hairston's trial.

Hairston gave the police conflicting accounts of what happened. At times he admitted that he might have shot the victims, while at other times he denied committing the crimes. When he testified in his defense, he said he had been drinking heavily the entire weekend, and that he was very drunk on Christmas day—so drunk that he was hallucinating and thought that the victims were three African-American men who were demanding money for drugs he had bought in New York. He claimed that all he remembered about the shooting was seeing Modoski lying on the floor while Kerestes was screaming at him to get out of the house.

*Hairston v. Hendrick*, No. Civ. A. 99-5225 (D.N.J. July 27, 2012) (internal citations

omitted).

4

Hairston was charged in state court with first-degree murder and the prosecution sought the death penalty. Hairston pleaded not guilty and was tried before a jury in the fall of 1991. In part because of the high stakes and racial dimension of the trial, voir dire took several months and involved hundreds of potential jurors. Each prospective juror completed a two-part, 19-page questionnaire. Part I contained five questions pertaining to the juror's background, education, and potential biases; Part II asked five questions about the juror's views on the death penalty. After administering the questionnaire, the trial court and parties met with each juror individually, asking questions similar to those in the questionnaire. It took 27 days to select the final pool of 52 eligible jurors.

The state exercised ten of its twelve peremptory challenges; seven of the ten were used to strike African-Americans. Hairston's counsel moved for a mistrial pursuant to *Batson* and *State v. Gilmore*, 511 A.2d 1150 (N.J. 1986),[1] alleging racial discrimination. After hearing the prosecution's explanations for exercising its peremptory challenges, as well as defense counsel's rebuttal, the trial court denied the *Batson* motion.

Soon thereafter, the jury, which included three African-Americans, was seated. After a thirteen-day trial, the jury convicted Hairston on all counts but did not impose the

---

[1] The New Jersey state counterpart to *Batson*, *Gilmore* enunciated a similar three-step test to establish unconstitutional discrimination in the use of peremptory challenges. *Gilmore*, 103 A.2d at 1157.

death penalty. The trial court sentenced Hairston to life imprisonment with forty years' parole ineligibility.

Hairston appealed to the New Jersey Superior Court, Appellate Division, raising, *inter alia*, the *Batson* claim. The Appellate Division affirmed, stating: "After hearing argument by both sides, the trial judge denied defendant's motion finding that the State had put forth valid reasons for the exercise of its challenges . . . . We hold that the [trial] judge's findings were sufficiently grounded in the record." A116-17; *State v. Hairston*, A4203-91T4 (N.J. App. Div. Feb. 21, 1995) (*Hairston II*). Hairston appealed to the New Jersey Supreme Court, which denied certification. 658 A.2d 728 (N.J. 1995) (*Hairston III*).

In 1997, Hairston petitioned the same New Jersey trial court for post-conviction relief, again raising the *Batson* claim. A125-31 (*Hairston IV*). The trial court declared the *Batson* issue moot because it was already resolved on the merits. A131; *see* N.J. Ct. R. 3:22-5 (barring a petitioner for post-conviction relief from presenting a claim that has been previously adjudicated). Hairston appealed this decision to the New Jersey Superior Court, Appellate Division, which affirmed the trial court's denial of post-conviction relief. *State v. Hairston*, No. A4659-96T4 (N.J. Super. Ct. App. Div. Aug. 31, 1998) (*Hairston V*). The New Jersey Supreme Court again denied certification. *State v. Hairston*, 731 A.2d 46 (N.J. 1999) (*Hairston VI*).

In November 1999, having exhausted his state remedies, Hairston filed a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the District of New Jersey. Again, he raised *Batson* claims along with three other grounds for relief.  In February 2000, the District Court dismissed the petition for failure to file within AEDPA's one-year limitation period. *See* 28 U.S.C. § 2244(d)(1). Hairston moved to reinstate his petition, arguing that it was timely because the one-year limitation period began to run on April 24, 1996, AEDPA's effective date, and was tolled while his petition was pending until April 30, 1999, the date the New Jersey Supreme Court denied certification. Therefore, he argued, the one-year limitation period began running on April 30, 1999, and his petition, filed November 9, 1999, was within the one-year limitation period. The District Court agreed and reinstated his petition on March 7, 2000.

Over the next twelve years, Hairston filed pro se motions and wrote letters to the District Court requesting an answer to his petition for habeas relief.  On June 17, 2002, Hairston sent a letter to the court inquiring about the case and received a response from Roy Hendrick, Attorney General of New Jersey.[2]  On September 2, 2003, Hairston filed a motion to compel the state to answer his habeas petition. The  District Court granted the motion to compel on December 1, 2003. The state's answer to the petition is missing

---

[2] This letter is missing from the record. Many of the state court files were purged in 2009, and parts of the District Court record are also, for reasons unknown, unavailable.

from the record.  Over the next nine years, Hairston wrote eight more letters to the

District Court inquiring about the status of the case.

On July 9, 2012, the District Court denied Hairston's § 2254 petition and request

for a certificate of appealability relying on the record from the state courts; it did not hold

an evidentiary hearing. *Hairston v. Hendricks*, No. Civ. A. 99-5225 (D.N.J. July 27,

2012) (unpublished). Hairston timely appealed and we issued a certificate of appealability

for the *Batson* claim only.  We appointed counsel for Hairston.

## II[3]

Because the District Court "did not hold an evidentiary hearing and engage in

independent factfinding . . . our review of its final judgment is plenary." *Hardcastle v.*

*Horn*, 368 F.3d 246, 254 (3d Cir. 2004) (internal citation and quotation marks omitted).

Therefore, we will apply "the same standard [of review] that the District Court was

required to apply." *Lewis v. Horn*, 581 F.3d 92, 100 (3d Cir. 2009) (internal citation

omitted).

AEDPA applies to Hairston's petition, which was filed on November 8, 1999. 28

U.S.C. § 2254. Under AEDPA, we review the state court's determinations on the merits

only to ascertain whether the court reached a decision that was "contrary to, or involved

---

[3] The District Court had jurisdiction under 28 U.S.C. § 2254. We have jurisdiction under 28 U.S.C. § 2253.

an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court . . . [or]  was based on an unreasonable determination of the facts." 28

U.S.C. § 2254(d)(1)-(2); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (internal

quotation marks omitted); *Bond v. Beard*, 539 F.3d 256, 263 (3d Cir. 2008). This is a

high bar, since a state court's findings are "presumed to be correct," 28 U.S.C. §

2254(e)(1), and we may grant habeas relief only if "the state court decision . . . resulted in

an outcome that cannot reasonably be justified under existing Supreme Court precedent."

*Hackett v. Price*, 381 F.3d 281, 287 (3d Cir. 2004).

AEDPA deference is due only if the state court has adjudicated the issue on the

merits; if not, we exercise plenary review. *See* 28 U.S.C. § 2254(e)(1); *Holloway v. Horn*,

355 F.3d 707, 718 (3d Cir. 2004) ("We have interpreted § 2254's 'adjudication on the

merits' language to mean that when . . . the state court has not reached the merits of a

claim thereafter presented to a federal habeas court, the deferential standards provided by

AEDPA . . . do not apply.") (internal citations and quotation marks omitted).

We review the "last reasoned state-court opinion," *Ylst v. Nunnemaker,* 501 U.S.

797, 803-04 (1991), which in this case is *Hairston II*, the New Jersey Appellate

Division's decision on direct appeal.[4] Therefore, the applicable standard of review hinges

---

[4] The Supreme Court "reconfirm[ed]" in *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011), that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the

9

on whether the *Hairston II* court properly adjudicated the *Batson* claim on the merits. 28

U.S.C. § 2254(d); *Richter*, 131 S. Ct. at 780.

B

*Batson* established "a three-step inquiry for determining the constitutionality of

challenged peremptory strikes." *Hardcastle*, 368 F.3d at 255 (citing *Riley v. Taylor*, 277

F.3d 261, 275 (3d Cir. 2001)).

> First, the trial court must determine whether the defendant has made a
> prima facie showing that the prosecutor exercised a peremptory challenge
> on the basis of race. Second, if the showing is made, the burden shifts to the
> prosecutor to present a race-neutral explanation for striking the juror in
> question. Although the prosecutor must present a comprehensible reason,
> "[t]he second step of this process does not demand an explanation that is
> persuasive or even plausible"; so long as the reason is not inherently
> discriminatory, it suffices. Third, the court must then determine whether the
> defendant has carried his burden of proving purposeful discrimination. This
> final step involves evaluating "the persuasiveness of the justification"
> proffered by the prosecutor, but "the ultimate burden of persuasion rests
> with, and never shifts from, the opponent of the strike."

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal citations omitted).

A *Batson* claim has been adjudicated on the merits when all three steps of the

analysis have been reached. *Bond v. Beard*, 539 F.3d 256, 264 (3d Cir. 2008) ("Failure to

---

contrary." *Id.* at 784-85. However, the presumption "may be overcome when there is
reason to think another explanation for the state court's decision is more likely"—such as
a dismissal of the claim on procedural grounds. *Id.* at 785, 787 (internal citations
omitted). In this appeal, the presumption of adjudication does not apply to the state court
decisions on post-conviction review (*Hairston IV-V*) because the *Batson* issue was
procedurally barred under New Jersey law.

make a step-three finding . . . would render the state court's decision either 'contrary to'

or an 'unreasonable application' of *Batson* . . . and we would not apply AEDPA

deference.") (citing *Hardcastle*, 368 F.3d at 259).  Because the *Hairston II* court

"essentially incorporated" the trial court's reasoning, *see Bond*, 539 F.3d at 269, we will

examine both courts' adjudications of the *Batson* claim.

III

Jury selection in Hairston's trial was a painstaking affair, taking several months

and involving hundreds of potential jurors. During this process, seven of the state's ten

peremptory challenges were used to strike African-Americans. Defense counsel moved

for a mistrial pursuant to *Batson* and *Gilmore*, alleging that the prosecution exercised its

challenges on the basis of race. The trial court found that Hairston had succeeded in

making a prima facie case of discrimination. The prosecution then proceeded to explain

its decisions to strike each of the seven excused African-American jurors.

The first excused juror "struggled with the idea of imposing the death penalty" and

believed that "alcohol and drugs make you do things that you wouldn't do." A66-67. This

led the prosecution to believe she would be amenable to Hairston's intoxication defense.

The second excused juror showed up on the wrong day and looked uninterested

and even "pained by the process." A68-69. Noting the fact that the juror "went to the

Fashion Institute of Technology," the prosecutor stated: "I know we sometimes make

generalizations, but it's been some of my experience that people in that field tend to be

11

more liberal people." A68. The prosecutor also believed she lacked the "mental upkeep" required to understand a complex trial. A68-69. The juror indicated that she was opposed to the death penalty "unless the crime was against innocent children," and "[only] if she was convinced that there was no rehabilitation." A69.

The third excused juror said he would impose the death penalty only for a premeditated murder, and seemed amenable to imposing a 30-year sentence in this case. He also stated that "the more alcohol people drink, the more they are affected," which led the prosecution to believe he would be sympathetic to the intoxication defense. A71-72. Finally, the prosecution noted that he had not disclosed a prior disorderly-person conviction, which counsel believed rendered him untrustworthy.

The fourth juror believed people could drink so much that they become unaware of their own actions, and appeared to the prosecution as if "she absolutely [did] not want to be [there]." A72. Regarding the death penalty, she stated that "there are always extended [sic] circumstances," suggesting that she would be prone to finding mitigating factors at the penalty phase. A73.

The fifth juror was excused because he had a graduate degree in behavioral sciences and worked in the alcoholism field for 23 years, leading prosecutors to believe he would be favorably disposed to the intoxication defense.

The sixth juror spoke of "blackouts" from drinking, and, in response to the prosecution's hypothetical involving the perpetrator of a murder-robbery, stated "I'm not

certain. The guy may be innocent." A77-78. This led the prosecution to believe that she would "never execute." A77-78.

The seventh juror's husband was an alcoholic and attended Alcoholics Anonymous meetings herself. She believed that her brother, who was incarcerated at the time, had not been treated fairly by the criminal justice system.  In addition, her nephew had been recently charged with dealing drugs in a nearby town, a case that may have been handled by the same prosecutor's office. This led the prosecution to believe that she might not be able to give their side a "fair hearing." A78. She also expressed ambivalence about imposing the death penalty.

After the prosecutor articulated these explanations, the trial court turned to defense counsel and asked if he had any other comments to make in response.

THE COURT: Counsel, any response?

[DEFENSE COUNSEL]: I'd like to have some time to prepare an adequate response, your Honor. We've talked about 7 jurors right now.

THE COURT: What do you – by proper response you [sic] going to seek to argue that he was reasonable or unreasonable on each one of these?

[DEFENSE COUNSEL]: Oh absolutely.

THE COURT: Well, I don't think that's absolutely necessary, truthfully. He has to put forth an argument that he believes will justify his exercise of challenges; that doesn't mean that you have a right to respond to each and every statement he made based upon what he says. You disagree with it so be it, but we're not going to take the time for you to sit down and prepare a step by step rebuttal to this stuff.

13

A81. Defense counsel responded that the State's proffered explanations were "vague, unexplainable reasons" and argued that the stricken jurors' answers had not been very different from those of the remaining, sitting jurors. A81-82. He pointed to one white juror who was an alcoholic and had been through Alcoholics Anonymous three times, yet was not excused.  He argued that the prosecution had mischaracterized statements the stricken jurors had made, and that many of the potential jurors excused for being averse to the death penalty had actually expressed "average" support for the death penalty.  At various points during defense counsel's rebuttal, the trial court attempted to cut him off, stating: "[W]e're not going to argue everybody who's on this jury as against the people that are off this jury, we will never finish the case that way." A82. "I don't want you to go into every sitting juror here, comparing them to people who have been excused. Confine your comments to those people who have been excused you think wrongfully please." A89.

Defense counsel responded to the trial court by pointing out that *Batson* and *Gilmore* actually require courts to consider comparable facts about sitting jurors in order to determine whether the prosecution's stated reasons were pretextual.  Still, the trial court insisted that defense counsel limit his discussion to those jurors who were

14

dismissed.[5]  Accordingly, defense counsel confined his rebuttal to the following points:

(1) the first juror was presented as weak on the death penalty, but her support for the

death penalty was average for the pool of jurors, including the remaining jurors.  (2) The

second juror, a college graduate, was presented as intellectually incapable of

understanding the law yet was more educated than several sitting jurors.  (3) The third

juror was never asked about his disorderly-person conviction, so he did not fail to

disclose it. Moreover, he had expressed that if an alcoholic had an opportunity to get help

and did not, then he would readily give the death penalty.  (4) The fourth juror's views on

alcoholism would not have trumped his otherwise strongly pro-death penalty stance.  (5)

The fifth juror was excused partially for her answer to the "reality question" of "could

you do it?" but a white male whose answer to the same question was more problematic

for the prosecution remained on the jury.  (6) The sixth juror had clearly stated that

"drugs or alcohol are not an excuse" for criminal conduct.  (7) Despite the seventh juror's

experience with alcoholism, she stated that alcohol makes people do things they have

within them, and strongly supported the death penalty, expressing concern over the

expense of keeping such a perpetrator in prison.

At the conclusion of defense counsel's rebuttal, the trial judge stated:

---

[5] Fourteen years later, the Supreme Court held that "side-by-side comparisons" of stricken black jurors and sitting white jurors can be "powerful" evidence of discrimination in a *Batson* determination. *Miller–El v. Dretke,* 545 U.S. 231, 241 (2005).

Each one of these people took an hour and a half to two hours to qualify when we did the voir dire. It . . . is possible . . . to pull out in that hour and a half anything . . . to support your view. . . . *I find the State has put forth valid reasons for the exercise of these challenges. That the defense doesn't concur is not surprising.* Of course, each side has a very distinct point of view in this case, in all cases, but the defense does not have a right . . . to put . . . himself into [the] prosecutor's shoes [to] determine what challenges in their view were valid.

[The] Prosecutor set forth on the record reasons for excusing each one of these people relating to views about the death penalty, reasons about use of alcohol, reasons involving family members in crime, and those reasons I find to be valid and sufficient in the record. Therefore the defense request for a mistrial is denied.

A91-92 (emphasis added). After another comment from defense counsel, the trial court

repeated its position, stating: "All the State needs to do it's done. It [has] set forth reasons

which I find to be valid for the exercise of his challenge." A94.

The Appellate Division (*Hairston II*) first found that *Batson*'s first two steps were

satisfied: Hairston had made a prima facie case of discrimination, and the prosecution had

presented race-neutral explanations for each of the peremptory challenges used to strike

African-American prospective jurors. A114-17. It then concluded:

*After hearing argument by both sides*, the trial judge denied defendant's motion finding that the State had put forth valid reasons for the exercise of its challenges . . . . *We hold that the [trial] judge's findings were sufficiently grounded in the record* and that his denial of a mistrial constituted a reasonable exercise of his discretion. The State carried its burden by articulating clear and reasonably specific explanations of its legitimate reasons for exercising each of the peremptory challenges.

A116-17 (emphases added) (internal citations and quotation marks omitted).

16

The parties do not dispute that the first two steps of *Batson* were reached. At issue, then, is whether the Appellate Division—which incorporated the reasoning of the trial court—reached *Batson*'s third step to determine whether Hairston had carried his burden of proving purposeful discrimination, i.e., "that it is more likely than not that the prosecutor struck at least one juror because of race." *Bond*, 539 F.3d at 264 (internal citation omitted). "At step three, the trial judge must make a finding regarding the [prosecutor's] motivation." *Id.* (internal citation and quotation marks omitted).

Unfortunately, this is a case where "[t]he state courts repeatedly failed to identify the three steps of the *Batson* analysis explicitly. This renders our task harder on review, as we must attempt to discern what those courts did in fact perform at each step." *Bond*, 539 F.3d at 268. The record here, as in *Bond*, "gives serious cause for concern that the state courts did not reach the third step of the *Batson* analysis." *Id.* In *Bond*, we were troubled that the trial court had indicated that it

> believed that it could stop after the prosecutor satisfied the second step of the *Batson* analysis by stating a race-neutral explanation for a strike. The *voir dire* transcript never explicitly clarifies whether, in accepting explanations to be race-neutral, the trial court or the Pennsylvania Supreme Court believed that the prosecutor truly had acted in a race-neutral fashion (satisfying step three of the *Batson* analysis), or merely that the stated explanations were race-neutral (at step two).

*Id.* We were also concerned that the trial court had stated, as the trial court stated here, that it was "not going to try and get into the [prosecutor's] mind" and further suggested that it only needed "some objective statement that's racially neutral." *Id.* (internal

17

citations omitted). Nevertheless, after reviewing the state court record closely, we

concluded in *Bond* that the state court had, in fact, reached step three:

> The Pennsylvania Supreme Court essentially incorporated the reasoning of
> the trial court . . . . It described the trial court as accepting the prosecutor's
> explanations as "legitimate and race neutral," and referred to the trial
> court's findings "as to the legitimacy of the race neutral responses offered in
> this case." The emphasis on legitimacy demonstrates that the Supreme
> Court considered the third step of the *Batson* analysis. Had it stopped at the
> second step, it merely would have inquired into the existence of "race
> neutral" explanations or responses. But it also described the legitimacy of
> those "race neutral" explanations. It considered, in other words, whether the
> prosecutor had told the truth when he offered race-neutral explanations. It
> concluded that he had done so. This amounts to a determination on the
> merits at the third step of the *Batson* analysis.

*Id.* at 269.

Here, as in *Bond*, we are concerned to the extent that the Appellate Division

implied that the *Batson* analysis was over once "[t]he State carried its burden by

articulating clear and reasonably specific explanations" of its peremptory challenges.

A117. Scrutiny of the trial court's ruling from the bench and the Appellate Division's

analysis of the claim, however, shows that neither the trial court nor the Appellate

Division stopped at step two. Although the Supreme Court had declined in *Batson* "to

formulate the particular procedures to be followed upon a defendant's timely objections

to a prosecutor's challenges," it did instruct that it is the trial court's "duty to determine if

the defendant has established purposeful discrimination." 476 U.S. at 98, 99. And the

Supreme Court reiterated that "'a finding of intentional discrimination is a finding of

fact' entitled to . . . great deference." *Id.* at 98 & n.21 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). Consistent with this instruction, the trial judge heard argument from both sides about the strikes. Defense counsel made arguments in rebuttal, and then prompted the trial court to consider these arguments, stating:

> This is not a case of accepting that the prosecutor has a—valid reasons. You've heard the reasons. *Now the court's got to make a determination if they're valid or not.* The only way I think we can do that is to, to reflect that against the people who were not excused . . . .

A91 (emphasis added). The trial court then declared: "[The] Prosecutor set forth on the record reasons for excusing each [stricken juror] . . . and those reasons I *find* to be valid and sufficient in the record. A92 (emphasis added). In other words, the trial court made a finding that the reasons proffered by the prosecutor, who had conducted voir dire before the judge for 27 days, were credible.

The Appellate Division recognized that the trial judge had proceeded to step three in the *Batson* analysis. It noted that the trial court did not simply accept the prosecution's reasons as race-neutral without evaluating their credibility. Rather, the Appellate Division pointed out that the trial court had heard argument from "both sides." A116. In fact, the record shows the trial court gave defense counsel multiple—though not unlimited—opportunities to rebut the prosecution's proffered race-neutral explanations. The Appellate Division then concluded that the trial judge had made findings, and held that "the [trial] judge's *findings* were *sufficiently grounded in the record*." A117 (emphasis

19

added). The focus on the trial judge's findings demonstrates that the state courts reached the third step of the *Batson* analysis. Moreover, the phrase "sufficiently grounded in the record" evidences a consideration of all of the facts and arguments presented. This is sufficient to establish a step three finding. *See Bond*, 539 F.3d at 267 (finding that step three was reached when the trial court stated: "Reviewing the totality of the circumstances, there is no showing of intentional discrimination."); *see also Hardcastle*, 368 F.3d at 259 ("[A] judge considering a *Batson* challenge is not required to comment explicitly on every piece of evidence in the record. However, some engagement with the evidence considered is necessary as part of step three of the *Batson* inquiry . . . .").

Obviously, an implicit step-three finding such as the one presented here requires us to engage in analysis that would not be necessary had the trial court explicitly adverted to each step. In Hairston's case, however, the *Batson* motion was made during jury selection—in "live combat," as the District Court put it—and the trial court was able to hear arguments from both sides and make credibility determinations. A17, 19 ("Deference must be paid to the trial judge, who had witnessed the jurors during voir dire and was able from his own experience of the question-and-answer to gauge credibility when the prosecutor gave his reasons."). The dissent believes that the trial judge was not equipped to make the necessary findings because it did not permit the defense to fully present its case. We conclude that a trial judge who presided over 27 days of voir dire conducted by the same counsel was well equipped to make a finding about whether he

20

believed the reasons given by the prosecutor for exercising the state's strike were a pretext for discrimination. Moreover, by referencing both sides' arguments and the full record, the Appellate Division demonstrated that it had considered the validity of the race-neutral explanations offered by the prosecution. This is a step-three finding, so we apply the deferential AEDPA standard of review. *Bond*, 539 F.3d at 269 (citing *Taylor v. Horn,* 504 F.3d 416, 433 (3d Cir. 2007) (explaining that AEDPA deference applies to implicit as well as explicit factual findings)).[6]

## V

As in so many habeas cases, the standard of review is outcome-determinative in this appeal. AEDPA "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error

---

[6] Hairston also argues that the *Batson* claim was not adjudicated on the merits because the state courts exclusively discussed the *Gilmore* standard and made only passing reference to *Batson*. *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) (establishing a presumption of adjudication on the merits of the federal claim when the state-law rule is "at least as protective as the federal standard"). The *Batson* and *Gilmore* tests are nearly identical, except that the *Gilmore* standard sets a higher threshold at step one, requiring a showing of a "substantial likelihood" of discrimination, see *Johnson v. California*, 545 U.S. 162, 172 (2005), whereas *Batson* simply requires a statement of facts that creates an "inference of discriminatory purpose" at step one. *Batson*, 476 U.S. at 94; see also *State v. Osorio*, 973 A.2d 365, 376-77 (N.J. 2009) (confirming that step one of Batson was less onerous than its Gilmore counterpart).

Here, the state court found that Hairston cleared step one; only step three was at issue. Therefore, on these facts, the *Batson* standard was not less protective than the state standard, and the presumption of adjudication applies. *Williams*, 133 S. Ct. at 1096.

correction through appeal." *Richter*, 131 S.Ct. at 786 (quotation omitted). The Supreme Court has stated that AEDPA "'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner v. Jackson,* 131 S. Ct. 1305, 1307 (2011) (internal citation omitted).

Applying AEDPA's deferential standard of review, we "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* Only if the petitioner demonstrates that the state court decision "was so lacking in justification" as to present error "beyond any possibility for fairminded disagreement" may we grant habeas relief. *Id.* at 786-87.

Hairston fails to meet this high threshold. The question here is not whether the state court correctly decided the *Batson* issue but whether there is *any* reasonable argument to be made that Hairston did not succeed in establishing purposeful discrimination. We hold that there was. Although defense counsel's rebuttal raised valid questions, it fell short of *compelling* the conclusion that the prosecution harbored racially discriminatory intent. Accordingly, we will defer to the Appellate Division's finding that the prosecution's exercise of its peremptory challenges was constitutional and affirm the order of the District Court.

22

**RENDELL**, <u>Circuit Judge</u>, <u>dissenting</u>:

While I recognize that AEDPA "'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state court decisions be given the benefit of the doubt,'" *Felkner v. Jackson*, 131 S. Ct. 1305, 1308 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 772 (2010)), I disagree with the majority's conclusion that the state court engaged in an objectively reasonable application of step three of the *Batson* inquiry on direct appeal. The record of both the state trial and appellate court proceedings reveal that both courts ended their analysis at step two. Thus, the *Batson* claim was never fully adjudicated on the merits. Where this error occurs in the state courts, our precedent dictates that we should conduct the step three analysis ourselves and determine from the voir dire transcripts whether the strikes were pretextual. *See, e.g.*, *Hardcastle v. Horn*, 368 F.3d 246, 262 (3d Cir. 2004). If that is not possible, habeas should be granted. *See Simmons v. Beyer*, 44 F.3d 1160, 1168 (3d Cir. 1995). I do not vote to grant habeas relief in this case lightly, but given our inability to reconstruct all that occurred in voir dire,[1] and given the questions raised by the portion of the record that we do have, I do not hesitate to urge that habeas relief should be afforded to Mr. Hairston.

---

[1] Jury voir dire was conducted over several months. Prospective jurors filled out a two-part, 19-page questionnaire. Some jurors were excused as early as July 1991 and the remainder were interviewed individually by the trial court and counsel beginning in September 1991. As the majority notes, it took approximately 27 days to select the final pool of 52 eligible jurors. Of the 43 jurors who were seated in court on the day the peremptory strikes were exercised, 10 were African American. Of the 10 peremptory strikes the prosecutor used, 7 were against African Americans.

    Unfortunately, the vast majority of the records of voir dire have been destroyed. (*See* App. 945-47.) We have the voir dire transcripts for only five impaneled jurors and one of the seven stricken African American jurors (Andrew Bryant). The races of the impaneled jurors whose voir dire testimony we have is not discernible from the record.

I.

A.

It is worth elaborating upon the analysis required in the *Batson* three-step inquiry in order to parse out the difference between steps two and three. After a defendant establishes a prima facie case of purposeful discrimination at step one, at step two, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson v. Kentucky*, 476 U.S. 79, 97 (1986). The *Batson* Court held that the "neutral explanation" should be "related to the particular case to be tried" and should not merely be an affirmation of the prosecutor's good faith. *Id.* at 98. Only if the trial court accepts the prosecutor's explanation at step two to be "facially valid[]," will it proceed to step three. *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

At step three, "the trial court . . . [has] the duty to determine if the defendant has established purposeful discrimination." *Batson,* 476 U.S. at 98. "In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Id.* at 93 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)). Though the Supreme Court in *Batson* declined "to formulate particular procedures to be followed," *id.* at 99, in performing the inquiry at each step, it notably drew upon Title VII jurisprudence to describe the burden shifting framework applicable in a *Batson* challenge. The Court stated, "[o]ur decisions concerning 'disparate treatment' under Title VII of the Civil Rights Act of 1964 have explained the operation of prima facie burden of proof rules. The party alleging that he has been the victim of intentional

2

discrimination carries the ultimate burden of persuasion." *id.* at 94 n.18 (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community*

*Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981); *United States Postal Serv. Bd. of*

*Governors v. Aikens*, 460 U.S. 711 (1983)).

In *McDonnell Douglas*, the Supreme Court established the three-step burden

shifting framework applicable in an employment discrimination case under Title VII.

First, the employee must make out a prima facie case of discrimination. 411 U.S. at 802.

The burden then shifts to the employer to present a nondiscriminatory reason for the

adverse employment action the employee has suffered. *Id.* Finally, the employee must

demonstrate that the reason given by the employer is pretextual. *Id.* at 804.  In *Burdine*,

the Court explained that an employee could meet his burden by "persuading the court that

a discriminatory reason more likely motivated the employer or . . . by showing that the

employer's proffered explanation is unworthy of credence." 450 U.S. at 256. The

*McDonnell Douglas* Court noted that particularly relevant at the third step would be

evidence that employees similarly situated to the plaintiff, but of a different race, did not

suffer adverse employment action. 411 U.S. at 804 ("Especially relevant to [] a showing

[of pretext] would be evidence that white employees involved in acts against [the

employer] of comparable seriousness . . . were nevertheless retained or rehired.").

Although the *Batson* Court did not explicitly elaborate upon the analysis required

at step three, by pointing to the *McDonnell Douglas* burden shifting framework, the

Court made clear that a *Batson* challenger has an analogous burden to show that opposing

3

counsel's justifications for the challenged peremptory strikes are pretextual.[2] Once a defendant is given "a full and fair opportunity to demonstrate that" the reasons offered by the prosecutor for his use of peremptory strikes "were in fact a coverup for a racially discriminatory decision," *McDonnell Douglas*, 411 U.S. at 805, the trial court "must decide which party's explanation of the [prosecutor's] motivation it believes." *Aikens*, 460 U.S. at 716. In other words, the trial court must make a finding of fact as to the prosecutor's true intentions. Difficult as making such a finding may be, the Supreme Court explained in *Aikens*, another Title VII case cited in *Batson*, "[t]he law often obliges finders of fact to inquire into a person's state of mind," *id.* at 716, by comparing the treatment of the plaintiff with the treatment of others.

## B.

Similarly, at step three of *Batson*, it is the exercise of comparing that is key. Here, it is abundantly clear that both the state trial and appellate courts failed to reach step three. The majority relies primarily upon *Bond v. Beard*, 539 F.3d 256 (3d Cir. 2008), in asserting that the state courts reached step three of *Batson*. In *Bond*, we found that the trial court reached the necessary step three conclusion when it stated: "Reviewing the totality of the circumstances, there is no showing of intentional discrimination by the prosecutor in the jury selection process and defendants are not entitled to a new trial on that basis." 539 F.3d at 267 (citations omitted). We explained:

---

[2] Just as side by side comparisons between black and white employees are the most powerful evidence in a Title VII case, side by side comparisons between black and white jury venire panelists are the most powerful evidence in a *Batson* challenge. The Supreme Court later reinforced the utility of side by side comparisons of stricken and impaneled jurors at step three of the *Batson* inquiry in *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

> Here, the trial court does more than conclude that the prosecutor offered a race-neutral explanation for a strike; it concludes that Bond did not meet his burden of showing that purposeful racial discrimination, not the proffered explanation, motivated the prosecutor's conduct. This step-three conclusion indicates that the trial court indeed did understand the steps of a *Batson* analysis.

*Id.* at 268-69.

In *Bond*, it was clear that the trial court made a determination as to whether the defendant had met his ultimate burden of showing intentional discrimination. Here, the trial court made no such finding. Rather, instead, the trial judge robbed defense counsel of the opportunity to carry his burden at step three, stating that he did not "have a right" to put "himself into [the] prosecutor's shoes," (App. 92) and critique the prosecutor's treatment of other jurors. Furthermore, the court suggested that a step three determination was impossible because, "[a]fter an hour and a half interview of anybody it is possible for either side to conclude that a segment supports their position." (App. 94.) As the majority notes, it was exactly this kind of language in *Bond* that gave us serious pause. *See Bond*, 539 F.3d at 268 (noting that trial court's statement that it was "not going to try and get into [the prosecutor's] mind" implied that court believed it could stop analysis after prosecutor satisfied step two); Majority Op. at 17.

By stating that "[a]ll the State needs to do it's done" (App. 94) and that the prosecutor's reasons for his strikes were "valid and sufficient in the record," (App. 92) the trial judge merely performed the step two inquiry.[3] At step two, the prosecutor carries

---

[3] The majority fails to note the context in which the trial court made the statement that the prosecutor's reasons were "valid and sufficient in the record." (App 92.) Here, context is key. Immediately before stating this conclusion, the trial court said:

the burden to present justifications for the challenged strikes and the relevant question for the trial judge is whether the given justifications are "facially valid." *Hernandez*, 500 U.S. at 360. The issue at step three is whether the prosecutor's reasons "relating to views about the death penalty, reasons about use of alcohol, [and] reasons involving family members in crime," were pretextual. (App. 92.)

Had the trial judge permitted defense counsel to make, and had the judge actually considered, the necessary side by side comparisons between seated white and excused black jurors that defense counsel urged he should be allowed to present, the judge would have been at least equipped to determine if intentional discrimination was at play. For example, while the prosecutor could meet his burden at step two by stating that he had exercised a strike against a black juror because of the juror's views on capital punishment, the judge could have found this reason to be pretextual at step three if white jurors with similar views on capital punishment were, nevertheless, seated. Instead,

---

Each one of these people took an hour and a half to two hours to qualify when we did the voir dire. It is . . . possible really to pull out in that hour and a half anything . . . to support your view. Gilmore requires that if there's a showing, that the State must come forward with reasons as to why it used its challenges. . . . I do find now the State has put forth valid reasons for the exercise of these challenges. That the defense doesn't concur is not surprising. Of course each side has a distinct point of view of . . . this case, in all cases, but the defense does not have a right I don't believe to put its own place – put himself into [the] prosecutor's shoes [to] determine what challenges in their view were valid, invalid.

(App. 91-92.) The trial court thus indicated that it is impossible to uncover a prosecutor's true motivations for his strikes, even though this is precisely a trial judge's task at step three of *Batson*. I, therefore, cannot agree with the majority that the trial court's finding that the prosecutor's reasons were "valid and sufficient in the record" had anything to do with an evaluation of the credibility of the reasons given. *See* Majority Op. at 19.

6

however, the trial judge here effectively ruled that defense counsel did not have the right to challenge the credibility of the prosecutor's proffered reasons by drawing comparisons once the judge found them to be race neutral at step two. While defense counsel was able to sneak some comparisons between seated and excused jurors into the record in spite of the judge's instructions, the judge made it clear that he was not interested in, and would not consider, these comparisons.[4]

Simply acknowledging that the prosecutor has satisfied his burden at step two cannot constitute a determination as to whether the defendant has shown purposeful discrimination; otherwise, step three would be superfluous. Here, the trial judge not only failed to comment on the credibility of the explanations offered by the prosecutor but also indicated that he believed it would be impossible to discern from the record whether or not there had been intentional discrimination. Therefore, the trial judge omitted the third step of the *Batson* inquiry.

The Appellate Division committed the same error in failing to evaluate the credibility of the prosecutor's proffered explanations. The majority acknowledges that the Appellate Division "essentially incorporated," Majority Op. at 16 (quoting *Bond*, 539 F.3d at 269), the trial court's reasoning in its *Batson* determination, yet the majority is

---

[4] Similarly, it is irrelevant that the *Batson* motion was made during jury selection – in "live combat," as the District Court and majority note. The fact that the trial judge presided over 27 days of voir dire and may have been "equipped to make a finding about whether he believed the reasons given by the prosecutor for exercising the state's strike," does not mean that he actually made such a credibility determination. Here, we have no reason to think that he did since he suggested that such a determination would be impossible. Moreover, the length of the voir dire proceedings in this case actually indicates that it was highly improbable that the trial judge was able to recall the true responses of a prospective juror without reviewing the record and refreshing his memory.

satisfied with the Appellate Division's analysis because the Appellate Division concluded

that the trial court had only accepted the prosecutor's proffered explanations as "valid"

and "legitimate," "[a]fter hearing argument by both sides." (App. 116-17); *see* Majority

Op. at 19. The Appellate Division further stated that the trial court's finding of validity

was "sufficiently grounded in the record." (App. 117.) The majority fails to note,

however, that the "finding" made by the trial court and affirmed by the Appellate

Division was only that the prosecutor had satisfied his burden *at step two*. Indeed, at the

end of its analysis of the peremptory strikes, the Appellate Division quoted directly from

*Batson's* step two: "The State carried its burden by articulating 'clear and reasonably

specific' explanations of its 'legitimate reasons' for exercising each of the peremptory

challenges." (App. 117 (quoting *Batson*, 476 U.S. at 98 n.20) (additional citations

omitted).) As previously explained, in *Batson*, the Supreme Court held that a prosecutor's

"neutral explanation" should be "related to the particular case to be tried" and should not

merely be an affirmation of the prosecutor's good faith. *Id.* at 98. The footnote in *Batson*

quoted by the Appellate Division was merely a clarification of the prosecutor's burden at

step two.[5] Indeed, the Supreme Court has since explained exactly what was meant by this

footnote:

---

[5] In full, the footnote reads:

> The Court of Appeals for the Second Circuit observed in *McCray v.*
> *Abrams,* that "[t]here are any number of bases" on which a prosecutor
> reasonably may believe that it is desirable to strike a juror who is not
> excusable for cause. As we explained in another context, however, the
> prosecutor must give a "clear and reasonably specific" explanation of his
> "legitimate reasons" for exercising the challenges.

> This warning was meant to refute the notion that a prosecutor could satisfy
> his burden of production by merely denying that he had a discriminatory
> motive or by merely affirming his good faith. What it means by a
> 'legitimate reason' is not a reason that makes sense, but a reason that does
> not deny equal protection.

*Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam). The Court explained that only at

the third step does the question of whether or not a reason "makes sense" come into play:

"It is not until the *third* step that the persuasiveness of the justification becomes relevant-

the step in which the trial court determines whether the opponent of the strike has carried

his burden of proving purposeful discrimination." *Id.* at 768.

Thus a court must find a prosecutor's justification to be "legitimate," "valid," and

"sufficiently grounded in the record" before it may even proceed to step three. Only "then

will [the trial court] have the duty to determine if the defendant has established

purposeful discrimination." *Batson*, 476 U.S. at 98. Here, the statement by the Appellate

Division that the prosecutor had provided "legitimate reasons" for his challenges only

meant that he had provided race neutral reasons actually "related to the particular case to

be tried," *id.*, not that those reasons were truthful or genuine.[6]

---

*Batson*, 476 U.S. at 98 n.20 (citations omitted).

[6] I note that in *Bond*, we concluded that the use of the word "legitimate" conveyed a step three determination. But there, the state appellate court reasoned as follows: "[b]ased upon our review of the record we find no reason to disturb the findings of the trial court as to the legitimacy of the race neutral responses." 539 F.3d at 268 (internal quotation marks omitted). We held that, "[t]he emphasis on legitimacy demonstrates that the [Pennsylvania] Supreme Court considered the third step of the *Batson* analysis. Had it stopped at the second step, it merely would have inquired into the existence of 'race neutral' explanations or responses." *Id.* at 269.

Where state courts have omitted step three, we have not hesitated to conduct de novo review. In *Hardcastle v. Horn*, 368 F.3d 246 (3d Cir. 2004), the Pennsylvania Supreme Court reviewed Hardcastle's challenge to the prosecutor's use of peremptory strikes on direct appeal in light of the intervening change in law announced in *Batson*. The court independently combed through the records of voir dire to determine if there were possible race-neutral bases for the challenged peremptory strikes. *Id.* at 252. After coming up with potential justifications for each strike, the court "concluded that Hardcastle failed to establish a *prima facie* case of improper use of peremptory challenges under *Batson*." *Id.* at 253. On appeal of the district court's grant of Hardcastle's habeas petition and under AEDPA, we agreed with the district court that the state court had failed to properly engage in step one but held that the court's decision to proceed with step two "moot[ed] the issue of whether Hardcastle made a sufficient showing at step one." *Id.* at 256. Thus we proceeded to review the state court's findings

---

The use of the word "legitimate" in *Bond*, however, is distinguishable in three ways. First, it is clear that in *Bond*, the word "legitimate" referred to the truthfulness of the prosecutor's reasons rather than whether or not the proffered reasons were actually race neutral because the appellate court commented on the "legitimacy *of the race neutral responses*," (emphasis added) rather than on whether the prosecutor had offered "legitimate reasons." Second, as previously noted, in *Hairston II*, the appellate court was actually quoting directly from a footnote in *Batson* describing the prosecutor's burden at step two. Finally, in *Bond*, it was possible for the appellate court to say that the trial court had actually made findings as to the credibility of the prosecutor's explanations because the trial court had stated that, "[r]eviewing the totality of the circumstances, there is no showing of intentional discrimination by the prosecutor in the jury selection process." 539 F.3d at 267 (citations omitted). In other words, the trial court had actually made a step three determination to which the appellate court could defer. Here, the trial court did no such thing.

at the remaining steps and determined that the state court had completely omitted step

three. We explained:

> "[A] judge considering a *Batson* challenge is not required to comment
> explicitly on every piece of evidence in the record." However, "some
> engagement with the evidence considered is necessary as part of step three
> of the *Batson* inquiry," and this requires "something more than a terse,
> abrupt comment that the prosecutor has satisfied *Batson.*"

*Id.* at 259 (quoting *Riley v. Taylor*, 277 F.3d 261, 290-91 (3d Cir. 2001)). Then, quoting

the district court, we stated that the state court's decision "does not indicate that the court

engaged in any analysis or consideration of the credibility of the potential justifications it

had proffered. Rather, the court's decision reads as if the court accepted the justifications

at face value." *Id.* We therefore held that there was no step three determination to which

we could defer and remanded the case to the district court for an evidentiary hearing and

de novo review of Hardcastle's *Batson* claim. *Id.* We are now faced with a substantially

similar situation in which the trial and appellate courts made no effort to evaluate "the

credibility of the potential justifications" proffered. *Id.* Indeed, here, the trial court

blocked defense counsel's efforts to mount a credibility challenge. This is the crux of step

three. In the absence of any analysis of the credibility of the prosecutor's proffered

justifications for his strikes, there is no step three determination to which we can defer.

As such, AEDPA deference does not apply to the Appellate Division's decision and,

ideally, step three analysis of Hairston's *Batson* claim should be conducted de novo.


II.


11

Here, however, it is not possible to conduct a step three analysis based on the available trial records. Without all of the voir dire transcripts, we cannot determine whether or not the prosecutor's justifications were pretextual. For example, even though we have the full voir dire transcript of Mr. Bryant, it is impossible to determine whether the prosecutor's proffered justification for striking Mr. Bryant was pretextual because defense counsel was improperly cut off by the trial judge when he attempted to make the side by side comparisons between Mr. Bryant and impaneled jurors that are the hallmark of step three. Although defense counsel was still able to draw some comparisons on the record that could indicate pretext on the part of the prosecutor, we are missing relevant voir dire testimony of potential jurors and are left with defense counsel's characterizations of what was said. These characterizations alone should give us serious pause.

Specifically, the prosecutor asserted that he had exercised a peremptory strike against Mr. Bryant because Mr. Bryant had worked to rehabilitate drug users and alcoholics, and therefore would be sympathetic to Mr. Hairston. Defense counsel noted, however, that the prosecutor had failed to use a strike against Denise Jones, who was married to an alcoholic, and against Michael Pidgeon, who had enrolled in Alcoholics Anonymous three times. If defense counsel's descriptions of Ms. Jones's and Mr. Pidgeon's personal histories are true, this raises questions as to whether the prosecutor acted for the race-neutral reasons stated.

These questions are compounded by the prosecutor's misrepresentation of the record in offering justifications for his strike. The prosecutor told the trial judge that Mr.

12

Bryant had said that he had a graduate degree in sociology and had written a dissertation on "the relationship between people." (App. 74.) The prosecutor stated that when he asked for clarification regarding Mr. Bryant's dissertation, he received no response. From the voir dire transcripts, however, it is clear that the prosecutor never asked Mr. Bryant to explain the subject of his thesis, but that Mr. Bryant did so anyway when questioned by defense counsel. The prosecution's claim that it was confused as to what Mr. Bryant wrote his dissertation on is, therefore, belied by the record. In *Miller-El v. Dretke*, the Supreme Court indicated that failing to inquire during voir dire on an issue of alleged importance suggests pretext for discrimination. 545 U.S. at 241. Here, there is some evidence that the prosecutor's justifications for striking Mr. Bryant were pretextual, but without further evidence corroborating defense counsel's assertions regarding Ms. Jones and Mr. Pidgeon, we cannot conclusively determine whether the prosecutor purposefully discriminated against African Americans in striking Mr. Bryant from the jury panel.

## III.

We have held that where reconstruction of the record is not possible, "the prejudice stemming from our inability to review [a *Batson*] claim is not fairly borne by [the defendant]." *Simmons*, 44 F.3d at 1168. The appropriate remedy, therefore, is to grant Hairston's habeas petition, give the state an opportunity to retry him, and specify the time period within which the state must retry or release him. *See id.* at 1171. I, thus, respectfully dissent from the majority's opinion affirming the District Court's denial of Hairston's habeas petition.

13

EXHIBIT 2

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3098
_____

ALBERT C. HAIRSTON,
                                                    Appellant

v.

ROY L. HENDRICKS; ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

_____

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 2-99-cv-05225)
District Judge:  Honorable Katharine S. Hayden
_____

Argued March 6, 2014
Before:  RENDELL, SMITH and HARDIMAN, *Circuit Judges*.
_____

JUDGMENT
_____

        This cause came on to be heard on the record from the United States
District Court for the District of New Jersey and was argued by counsel on March 6,
2014.  On consideration whereof, it is now hereby

        ORDERED and ADJUDGED by this Court that the judgment of the United
States District Court for the District of New Jersey entered July 9, 2012, be and the same
is hereby AFFIRMED.  All of the above in accordance with the opinion of this Court.[1]

_____

        [1] It is noted that Chief Judge McKee and Judge Greenway voted for rehearing en
banc.

Costs taxed against Appellant.

ATTEST:


s/Marcia M. Waldron
Clerk

Dated: September 3, 2014